# STANLEY *v.* GEORGIA.

No. 293.  Argued January 14–15, 1969.—Decided April 7, 1969.

*Wesley R. Asinof* argued the cause and filed a brief for appellant.

*J. Robert Sparks* argued the cause for appellee. With him on the brief was *Lewis R. Slaton.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

An investigation of appellant's alleged bookmaking activities led to the issuance of a search warrant for appellant's home. Under authority of this warrant, federal and state agents secured entrance. They found very little evidence of bookmaking activity, but while looking through a desk drawer in an upstairs bedroom, one of the federal agents, accompanied by a state officer, found three reels of eight-millimeter film. Using a projector and screen found in an upstairs living room, they viewed the films. The state officer concluded that they were obscene and seized them. Since a further examination of the bedroom indicated that appellant occupied it, he was charged with possession of obscene matter and placed under arrest. He was later indicted for "knowingly hav[ing] possession of . . . obscene matter" in violation of Georgia law.[1] Appel-

---

[1] "Any person who shall knowingly bring or cause to be brought into this State for sale or exhibition, or who shall knowingly sell or offer to sell, or who shall knowingly lend or give away or offer to lend or give away, or who shall knowingly have possession of, or who shall knowingly exhibit or transmit to another, any obscene matter, or who shall knowingly advertise for sale by any form of notice, printed, written, or verbal, any obscene matter, or who shall knowingly manufacture, draw, duplicate or print any obscene matter with intent to sell, expose or circulate the same, shall, if such person has knowledge or reasonably should know of the obscene nature of such matter, be guilty of a felony, and, upon conviction thereof, shall be punished by confinement in the penitentiary for not less than one year nor more than five years: Provided, however, in the event the

lant was tried before a jury and convicted. The Supreme Court of Georgia affirmed. *Stanley* v. *State,* 224 Ga. 259, 161 S. E. 2d 309 (1968). We noted probable jurisdiction of an appeal brought under 28 U. S. C. § 1257 (2). 393 U. S. 819 (1968).

Appellant raises several challenges to the validity of his conviction.[2] We find it necessary to consider only one. Appellant argues here, and argued below, that the Georgia obscenity statute, insofar as it punishes mere private possession of obscene matter, violates the First Amendment, as made applicable to the States by the Fourteenth Amendment. For reasons set forth below, we agree that the mere private possession of obscene matter cannot constitutionally be made a crime.

The court below saw no valid constitutional objection to the Georgia statute, even though it extends further than the typical statute forbidding commercial sales of obscene material. It held that "[i]t is not essential to an indictment charging one with possession of obscene matter that it be alleged that such possession was 'with intent to sell, expose or circulate the same.' " *Stanley* v. *State, supra,* at 261, 161 S. E. 2d, at 311. The State and appellant both agree that the question here before us is whether "a statute imposing criminal sanctions upon the mere [knowing] possession of obscene matter" is constitutional. In this context, Georgia concedes that the present case appears to be one of "first

---

jury so recommends, such person may be punished as for a misdemeanor. As used herein, a matter is obscene if, considered as a whole, applying contemporary community standards, its predominant appeal is to prurient interest, i. e., a shameful or morbid interest in nudity, sex or excretion." Ga. Code Ann. § 26–6301 (Supp. 1968).

[2] Appellant does not argue that the films are not obscene. For the purpose of this opinion, we assume that they are obscene under any of the tests advanced by members of this Court. See *Redrup* v. *New York,* 386 U. S. 767 (1967).

560

impression . . . on this exact point,"[3] but contends that since "obscenity is not within the area of constitutionally protected speech or press," *Roth* v. *United States,* 354 U. S. 476, 485 (1957), the States are free, subject to the limits of other provisions of the Constitution, see, *e. g., Ginsberg* v. *New York,* 390 U. S. 629, 637–645 (1968), to deal with it any way deemed necessary, just as they may deal with possession of other things thought to be detrimental to the welfare of their citizens. If the State can protect the body of a citizen, may it not, argues Georgia, protect his mind?

It is true that *Roth* does declare, seemingly without qualification, that obscenity is not protected by the First Amendment. That statement has been repeated in various forms in subsequent cases. See, *e. g., Smith* v. *California,* 361 U. S. 147, 152 (1959); *Jacobellis* v. *Ohio,* 378 U. S. 184, 186–187 (1964) (opinion of BRENNAN, J.); *Ginsberg* v. *New York, supra,* at 635. However, neither *Roth* nor any subsequent decision of this Court dealt with the precise problem involved in the present case. Roth was convicted of mailing obscene circulars and advertising, and an obscene book, in violation of a federal obscenity statute.[4] The defendant in a companion case, *Alberts* v. *California,* 354 U. S. 476 (1957), was convicted of "lewdly keeping for sale obscene and indecent books, and [of] writing, composing and publishing an obscene advertisement of them . . . ." *Id.,* at 481. None of the statements cited by the Court in

---

[3] The issue was before the Court in *Mapp* v. *Ohio,* 367 U. S. 643 (1961), but that case was decided on other grounds. MR. JUSTICE STEWART, although disagreeing with the majority opinion in *Mapp,* would have reversed the judgment in that case on the ground that the Ohio statute proscribing mere possession of obscene material was "not 'consistent with the rights of free thought and expression assured against state action by the Fourteenth Amendment.'" *Id.,* at 672.

[4] 18 U. S. C. § 1461.

*Roth* for the proposition that "this Court has always assumed that obscenity is not protected by the freedoms of speech and press" were made in the context of a statute punishing mere private possession of obscene material; the cases cited deal for the most part with use of the mails to distribute objectionable material or with some form of public distribution or dissemination.[5] Moreover, none of this Court's decisions subsequent to *Roth* involved prosecution for private possession of obscene materials. Those cases dealt with the power of the State and Federal Governments to prohibit or regulate certain public actions taken or intended to be taken with respect to obscene matter.[6] Indeed, with one

---

[5] *Ex parte Jackson,* 96 U. S. 727, 736–737 (1878) (use of the mails); *United States* v. *Chase,* 135 U. S. 255, 261 (1890) (use of the mails); *Robertson* v. *Baldwin,* 165 U. S. 275, 281 (1897) (publication); *Public Clearing House* v. *Coyne,* 194 U. S. 497, 508 (1904) (use of the mails); *Hoke* v. *United States,* 227 U. S. 308, 322 (1913) (use of interstate facilities); *Near* v. *Minnesota,* 283 U. S. 697, 716 (1931) (publication); *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571–572 (1942) (utterances); *Hannegan* v. *Esquire, Inc.,* 327 U. S. 146, 158 (1946) (use of the mails); *Winters* v. *New York,* 333 U. S. 507, 510 (1948) (possession with intent to sell); *Beauharnais* v. *Illinois,* 343 U. S. 250, 266 (1952) (libel).

[6] Many of the cases involved prosecutions for sale or distribution of obscene materials or possession with intent to sell or distribute. See *Redrup* v. *New York,* 386 U. S. 767 (1967); *Mishkin* v. *New York,* 383 U. S. 502 (1966); *Ginzburg* v. *United States,* 383 U. S. 463 (1966); *Jacobellis* v. *Ohio,* 378 U. S. 184 (1964); *Smith* v. *California,* 361 U. S. 147 (1959). Our most recent decision involved a prosecution for sale of obscene material to children. *Ginsberg* v. *New York,* 390 U. S. 629 (1968); cf. *Interstate Circuit, Inc.* v. *City of Dallas,* 390 U. S. 676 (1968). Other cases involved federal or state statutory procedures for preventing the distribution or mailing of obscene material, or procedures for predistribution approval. See *Freedman* v. *Maryland,* 380 U. S. 51 (1965); *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58 (1963); *Manual Enterprises, Inc.* v. *Day,* 370 U. S. 478 (1962). Still another case dealt with an attempt to seize obscene material "kept for the purpose

exception, we have been unable to discover any case in which the issue in the present case has been fully considered.[7]

of being sold, published, exhibited . . . or otherwise distributed or circulated . . . ." *Marcus* v. *Search Warrant*, 367 U. S. 717, 719 (1961); see also *A Quantity of Books* v. *Kansas*, 378 U. S. 205 (1964). *Memoirs* v. *Massachusetts*, 383 U. S. 413 (1966), was a proceeding in equity against a book. However, possession of a book determined to be obscene in such a proceeding was made criminal only when "for the purpose of sale, loan or distribution." *Id.*, at 422.

[7] The Supreme Court of Ohio considered the issue in *State* v. *Mapp*, 170 Ohio St. 427, 166 N. E. 2d 387 (1960). Four of the seven judges of that court felt that criminal prosecution for mere private possession of obscene materials was prohibited by the Constitution. However, Ohio law required the concurrence of "all but one of the judges" to declare a state law unconstitutional. The view of the "dissenting" judges was expressed by Judge Herbert:

"I cannot agree that mere private possession of . . . [obscene] literature by an adult should constitute a crime. The right of the individual to read, to believe or disbelieve, and to think without governmental supervision is one of our basic liberties, but to dictate to the mature adult what books he may have in his own private library seems to the writer to be a clear infringement of his constitutional rights as an individual." 170 Ohio St., at 437, 166 N. E. 2d, at 393.

Shortly thereafter, the Supreme Court of Ohio interpreted the Ohio statute to require proof of "possession and control for the purpose of circulation or exhibition." *State* v. *Jacobellis*, 173 Ohio St. 22, 27–28, 179 N. E. 2d 777, 781 (1962), rev'd on other grounds, 378 U. S. 184 (1964). The interpretation was designed to avoid the constitutional problem posed by the "dissenters" in *Mapp*. See *State* v. *Ross*, 12 Ohio St. 2d 37, 231 N. E. 2d 299 (1967).

Other cases dealing with nonpublic distribution of obscene material or with legitimate uses of obscene material have expressed similar reluctance to make such activity criminal, albeit largely on statutory grounds. In *United States* v. *Chase*, 135 U. S. 255 (1890), the Court held that federal law did not make criminal the mailing of a private sealed obscene letter on the ground that the law's purpose was to purge the mails of obscene matter "as far as was consistent with the rights reserved to the people, and with a due regard to the security of private correspondence . . . ." 135 U. S., at 261. The

In this context, we do not believe that this case can be decided simply by citing *Roth*. *Roth* and its progeny certainly do mean that the First and Fourteenth Amendments recognize a valid governmental interest in dealing with the problem of obscenity. But the assertion of that interest cannot, in every context, be insulated from all constitutional protections. Neither *Roth* nor any other decision of this Court reaches that far. As the Court said in *Roth* itself, "[c]easeless vigilance is the watchword to prevent . . . erosion [of First Amendment rights] by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests." 354 U. S., at 488. *Roth* and the cases following it discerned such an "important interest" in the regulation of commercial distribution of

---

law was later amended to include letters and was sustained in that form. *Andrews* v. *United States,* 162 U. S. 420 (1896). In *United States* v. *31 Photographs,* 156 F. Supp. 350 (D. C. S. D. N. Y. 1957), the court denied an attempt by the Government to confiscate certain materials sought to be imported into the United States by the Institute for Sex Research, Inc., at Indiana University. The court found, applying the *Roth* formulation, that the materials would not appeal to the "prurient interest" of those seeking to import and utilize the materials. Thus, the statute permitting seizure of "obscene" materials was not applicable. The court found it unnecessary to reach the constitutional questions presented by the claimant, but did note its belief that "the statement . . . [in *Roth*] concerning the rejection of obscenity must be interpreted in the light of the widespread distribution of the material in Roth." 156 F. Supp., at 360, n. 40. See also *Redmond* v. *United States,* 384 U. S. 264 (1966), where this Court granted the Solicitor General's motion to vacate and remand with instructions to dismiss an information charging a violation of a federal obscenity statute in a case where a husband and wife mailed undeveloped films of each other posing in the nude to an out-of-state firm for developing. But see *Ackerman* v. *United States,* 293 F. 2d 449 (C. A. 9th Cir. 1961).

obscene material. That holding cannot foreclose an examination of the constitutional implications of a statute forbidding mere private possession of such material.

It is now well established that the Constitution protects the right to receive information and ideas. "This freedom [of speech and press] . . . necessarily protects the right to receive . . . ." *Martin* v. *City of Struthers,* 319 U. S. 141, 143 (1943); see *Griswold* v. *Connecticut,* 381 U. S. 479, 482 (1965); *Lamont* v. *Postmaster General,* 381 U. S. 301, 307–308 (1965) (BRENNAN, J., concurring); cf. *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925). This right to receive information and ideas, regardless of their social worth, see *Winters* v. *New York,* 333 U. S. 507, 510 (1948), is fundamental to our free society. Moreover, in the context of this case—a prosecution for mere possession of printed or filmed matter in the privacy of a person's own home—that right takes on an added dimension. For also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy.

> "The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized man." *Olmstead* v. *United States,* 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting).

See *Griswold* v. *Connecticut, supra;* cf. *NAACP* v. *Alabama,* 357 U. S. 449, 462 (1958).

These are the rights that appellant is asserting in the case before us. He is asserting the right to read or observe what he pleases—the right to satisfy his intellectual and emotional needs in the privacy of his own home. He is asserting the right to be free from state inquiry into the contents of his library. Georgia contends that appellant does not have these rights, that there are certain types of materials that the individual may not read or even possess. Georgia justifies this assertion by arguing that the films in the present case are obscene. But we think that mere categorization of these films as "obscene" is insufficient justification for such a drastic invasion of personal liberties guaranteed by the First and Fourteenth Amendments. Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home. If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds.

And yet, in the face of these traditional notions of individual liberty, Georgia asserts the right to protect the individual's mind from the effects of obscenity. We are not certain that this argument amounts to anything more than the assertion that the State has the right to control the moral content of a person's thoughts.[8] To

---

[8] "Communities believe, and act on the belief, that obscenity is immoral, is wrong for the individual, and has no place in a decent society. They believe, too, that adults as well as children are corruptible in morals and character, and that obscenity is a source of corruption that should be eliminated. Obscenity is not suppressed primarily for the protection of others. Much of it is suppressed for the purity of the community and for the salvation and welfare of the 'consumer.' Obscenity, at bottom, is not crime. Obscenity is sin." Henkin, Morals and the Constitution: The Sin of Obscenity. 63 Col. L. Rev. 391, 395 (1963).

some, this may be a noble purpose, but it is wholly inconsistent with the philosophy of the First Amendment. As the Court said in *Kingsley International Pictures Corp.* v. *Regents,* 360 U. S. 684, 688–689 (1959), "[t]his argument misconceives what it is that the Constitution protects. Its guarantee is not confined to the expression of ideas that are conventional or shared by a majority. . . . And in the realm of ideas it protects expression which is eloquent no less than that which is unconvincing." Cf. *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495 (1952). Nor is it relevant that obscene materials in general, or the particular films before the Court, are arguably devoid of any ideological content. The line between the transmission of ideas and mere entertainment is much too elusive for this Court to draw, if indeed such a line can be drawn at all. See *Winters* v. *New York, supra,* at 510. Whatever the power of the state to control public dissemination of ideas inimical to the public morality, it cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts.

Perhaps recognizing this, Georgia asserts that exposure to obscene materials may lead to deviant sexual behavior or crimes of sexual violence. There appears to be little empirical basis for that assertion.[9] But more important, if the State is only concerned about printed or filmed materials inducing antisocial conduct, we believe that in the context of private consumption of ideas and information we should adhere to the view that "[a]mong free men, the deterrents ordinarily to be

[9] See, *e. g.,* Cairns, Paul, & Wishner, Sex Censorship: The Assumptions of Anti-Obscenity Laws and the Empirical Evidence, 46 Minn. L. Rev. 1009 (1962); see also M. Jahoda, The Impact of Literature: A Psychological Discussion of Some Assumptions in the Censorship Debate (1954), summarized in the concurring opinion of Judge Frank in *United States* v. *Roth,* 237 F. 2d 796, 814–816 (C. A. 2d Cir. 1956).

applied to prevent crime are education and punishment for violations of the law . . . ." *Whitney* v. *California,* 274 U. S. 357, 378 (1927) (Brandeis, J., concurring). See Emerson, Toward a General Theory of the First Amendment, 72 Yale L. J. 877, 938 (1963). Given the present state of knowledge, the State may no more prohibit mere possession of obscene matter on the ground that it may lead to antisocial conduct than it may prohibit possession of chemistry books on the ground that they may lead to the manufacture of homemade spirits.

It is true that in *Roth* this Court rejected the necessity of proving that exposure to' obscene material would create a clear and present danger of antisocial conduct or would probably induce its recipients to such conduct. 354 U. S., at 486–487. But that case dealt with public distribution of obscene materials and such distribution is subject to different objections. For example, there is always the danger that obscene material might fall into the hands of children, see *Ginsberg* v. *New York, supra,* or that it might intrude upon the sensibilities or privacy of the general public.[10] See *Redrup* v. *New York,* 386 U. S. 767, 769 (1967). No such dangers are present in this case.

Finally, we are faced with the argument that prohibition of possession of obscene materials is a necessary incident to statutory schemes prohibiting distribution. That argument is based on alleged difficulties of proving an intent to distribute or in producing evidence of actual distribution. We are not convinced that such difficulties

---

[10] The Model Penal Code provisions dealing with obscene materials are limited to cases of commercial dissemination. Model Penal Code § 251.4 (Prop. Official Draft 1962); see also Model Penal Code § 207.10 and comment 4 (Tent. Draft No. 6, 1957); H. Packer, The Limits of the Criminal Sanction 316–328 (1968); Schwartz, Morals Offenses and the Model Penal Code, 63 Col. L. Rev. 669 (1963).

exist, but even if they did we do not think that they would justify infringement of the individual's right to read or observe what he pleases. Because that right is so fundamental to our scheme of individual liberty, its restriction may not be justified by the need to ease the administration of otherwise valid criminal laws. See *Smith* v. *California,* 361 U. S. 147 (1959).

We hold that the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime.[11] *Roth* and the cases following that decision are not impaired by today's holding. As we have said, the States retain broad power to regulate obscenity; that power simply does not extend to mere possession by the individual in the privacy of his own home. Accordingly, the judgment of the court below is reversed and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

Mr. Justice Black, concurring.

I agree with the Court that the mere possession of reading matter or movie films, whether labeled obscene or not, cannot be made a crime by a State without vio-

---

[11] What we have said in no way infringes upon the power of the State or Federal Government to make possession of other items, such as narcotics, firearms, or stolen goods, a crime. Our holding in the present case turns upon the Georgia statute's infringement of fundamental liberties protected by the First and Fourteenth Amendments. No First Amendment rights are involved in most statutes making mere possession criminal.

Nor do we mean to express any opinion on statutes making criminal possession of other types of printed, filmed, or recorded materials. See, *e. g.,* 18 U. S. C. § 793 (d), which makes criminal the otherwise lawful possession of materials which "the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation . . . ." In such cases, compelling reasons may exist for overriding the right of the individual to possess those materials.

lating the First Amendment, made applicable to the States by the Fourteenth. My reasons for this belief have been set out in many of my prior opinions, as for example, *Smith* v. *California,* 361 U. S. 147, 155 (concurring opinion), and *Ginzburg* v. *United States,* 383 U. S. 463, 476 (dissenting opinion).

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN and MR. JUSTICE WHITE join, concurring in the result.

Before the commencement of the trial in this case, the appellant filed a motion to suppress the films as evidence upon the ground that they had been seized in violation of the Fourth and Fourteenth Amendments. The motion was denied, and the films were admitted in evidence at the trial. In affirming the appellant's conviction, the Georgia Supreme Court specifically determined that the films had been lawfully seized. The appellant correctly contends that this determination was clearly wrong under established principles of constitutional law. But the Court today disregards this preliminary issue in its hurry to move on to newer constitutional frontiers. I cannot so readily overlook the serious inroads upon Fourth Amendment guarantees countenanced in this case by the Georgia courts.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The purpose of these clear and precise words was to guarantee to the people of this Nation that they should forever be secure from the general searches and unrestrained seizures that had been a hated hallmark of colonial rule under the notorious writs of. assistance of the British Crown. See *Stanford* v. *Texas,* 379 U. S. 476, 481. This most basic of Fourth Amendment guarantees was frus-

trated in the present case, I think, in a manner made the more pernicious by its very subtlety. For what happened here was that a search that began as perfectly lawful became the occasion for an unwarranted and unconstitutional seizure of the films.

The state and federal officers gained admission to the appellant's house under the authority of a search warrant issued by a United States Commissioner. The warrant described "the place to be searched" with particularity.[1] With like particularity, it described the "things to be seized"—equipment, records, and other material used in or derived from an illegal wagering business.[2] And the warrant was issued only after the Commissioner had been apprised of more than adequate probable cause to issue it.[3]

There can be no doubt, therefore, that the agents were lawfully present in the appellant's house, lawfully authorized to search for any and all of the items specified in the warrant, and lawfully empowered to seize any such

---

[1] "[T]he premises known as 280 Springside Drive, S. E., two story residence with an annex on the main floor constructed of brick and frame, in Atlanta, Fulton County, Georgia, in the Northern District of Georgia . . . ."

[2] "[B]ookmaking records, wagering paraphernalia consisting of bet slips, account sheets, recap sheets, collection sheets, adding machines, money used in or derived from the wagering business, records of purchases, records of real estate and bank transactions, the money for which was derived from the wagering business, and any other property used in the wagering business, which are being used and/or have been used in the operation of a bookmaking business or represent the fruits of a bookmaking business being operated in violation of Sections 4411, 4412 and 7203 IRC of 1954."

[3] Before the Commissioner were no less than four lengthy and detailed affidavits, setting out the grounds for the affiants' reasonable belief that the appellant was engaged in an illegal gambling enterprise, and that the paraphernalia of his trade were concealed in his house.

items they might find.[4] It follows, therefore, that the agents were acting within the authority of the warrant when they proceeded to the appellant's upstairs bedroom and pulled open the drawers of his desk. But when they found in one of those drawers not gambling material but moving picture films, the warrant gave them no authority to seize the films.

The controlling constitutional principle was stated in two sentences by this Court more than 40 years ago:

> "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron* v. *United States,* 275 U. S. 192, 196.

This is not a case where agents in the course of a lawful search came upon contraband, criminal activity, or criminal evidence [5] in plain view. For the record makes clear that the contents of the films could not be determined by mere inspection. And this is not a case that presents any questions as to the permissible scope of a search made incident to a lawful arrest. For the appellant had not been arrested when the agents found the films. After finding them, the agents spent some 50 minutes exhibiting them by means of the appellant's projector in another upstairs room. Only then did the agents return downstairs and arrest the appellant.

Even in the much-criticized case of *United States* v. *Rabinowitz,* 339 U. S. 56, the Court emphasized that "ex-

---

[4] The fact that almost no gambling material was actually found has no bearing, of course, upon the validity of the search. The constitutionality of a search depends in no measure upon what it brings to light. *Byars* v. *United States,* 273 U. S. 28, 29.

[5] See *Warden* v. *Hayden,* 387 U. S. 294.

ploratory searches . . . cannot be undertaken by officers with or without a warrant." *Id.*, at 62. This record presents a bald violation of that basic constitutional rule. To condone what happened here is to invite a government official to use a seemingly precise and legal warrant only as a ticket to get into a man's home, and, once inside, to launch forth upon unconfined searches and indiscriminate seizures as if armed with all the unbridled and illegal power of a general warrant.

Because the films were seized in violation of the Fourth and Fourteenth Amendments, they were inadmissible in evidence at the appellant's trial. *Mapp* v. *Ohio,* 367 U. S. 643. Accordingly, the judgment of conviction must be reversed.