Samuel M. KARP, Robert C. Tomashevsky, Harold Hariston and Harold Muskat, for themselves and for all others similarly situated, Plaintiffs,

v.

Major General Kenneth COLLINS, individually and as Commanding General of Headquarters, U. S. Army Training, Infantry and Fort Dix, New Jersey, et al., Defendants.

Civ. A. No. 756–69.

United States District Court,
D. New Jersey.

March 12, 1970.

628

Emerson Darnell, Mt. Holly, N. J., for plaintiffs.

Parker, McCay & Criscuolo, Mt. Holly, N. J., for Nicholas Ferrelli.

Arthur Sills, Atty. Gen. of N. J. pro se and for Ronald Polak, James Neil, John Parisi, Col. David B. Kelley.

Before FREEDMAN, Circuit Judge, and SHAW and WHIPPLE, District Judges.

FREEDMAN, Circuit Judge.

Two of the plaintiffs, Karp and Tomashevsky, operate a coffee house near Fort Dix, New Jersey, and the other two are soldiers stationed at Fort Dix. They brought this action seeking damages and an injunction against alleged acts of harassment in violation of their constitutional rights, and in addition a declaration of unconstitutionality and an injunction against the enforcement of two statutes of New Jersey, N.J.S. 2A:170–1 and 170–29(1), N.J.S.A., which are a part of the State's Disorderly Persons law. They designated the suit as a class action for themselves and others similarly situated and named as defendants the Commanding General at Fort Dix, certain military personnel there, the Superintendent of the New Jersey State Police and a number of state troopers, and the Attorney General of the State of New Jersey, as individuals and as members of a class.

At the suggestion of the court and with the agreement of the parties, the action was severed so that the plaintiffs' claim that the two statutes are unconstitutional on their face would be heard and decided by this three-judge court, constituted pursuant to 28 U.S.C. §§ 2281, 2284, while the claims for injunction and damages based on alleged harassment by the defendants would be heard by the district court judge to whom the case was first presented.[1] The parties also agreed at the suggestion of the court that prosecutions instituted under the statutes would be stayed pending the outcome of this proceeding.

Accordingly, the three-judge court heard oral argument on the application for preliminary injunction on the claim that the two statutes are unconstitutional on their face. At the suggestion of the parties, they were given leave to file supplemental briefs, but no such brief has been received from the defendants, although the filing date was extended and has long since gone by. We therefore proceed with the disposition of the case, regretting as we must the failure of the State to present more fully its views on the important constitutional questions presented.

The statutes are very different in their provisions, and their constitutionality therefore will be considered separately.

I.

N.J.S. 2A:170–1, N.J.S.A. provides: "Any person who is apprehended and cannot give a good account of himself, or who is engaged in an illegal occupation and who is in this state for an unlawful purpose, is a disorderly person. In any prosecution under this section the fact that the person apprehended cannot give a good account of himself or is engaged in an illegal occupation is prima facie evidence that he is present in this state for an unlawful purpose."

The statute is drawn from the State's old vagrancy law of 1898.[2] Its scope

1. See Jenkins v. McKeithen, 395 U.S. 411, 431–432, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); Heard v. Rizzo, 281 F.Supp. 720, 724–726 (E.D.Pa.), aff'd 392 U.S. 646, 88 S.Ct. 2307, 20 L.Ed.2d 1358 (1968); Hobson v. Hansen, 256 F.Supp. 18 (Bazelon, C. J., D.C.Cir. 1966), aff'd sub nom. Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175, 182 (1969).

2. L.1898, c. 239, § 2, p. 943.

and meaning today have very recently been examined and defined by the Supreme Court of New Jersey in State v. Zito, 54 N.J. 206, 254 A.2d 769 (1969). Chief Justice Weintraub, speaking for a unanimous court, declared that a failure to give a good account of oneself may not itself be punished or be made an essential element of the crime, nor may it serve as affirmative proof of presence for an unlawful purpose.[3] Instead, these provisions were read as intended merely to assure a suspect a chance to explain away the circumstances which might appear inculpatory, and therefore to require the police to offer him an opportunity for an explanation. The proof of such an offer by the police was declared a prerequisite to a prosecution under the statute, unless the circumstances prevented the offer or made it plainly unnecessary. The court was careful to state that the policeman's evaluation of the sufficiency of the suspect's explanation would have no weight at the trial, for the court and not the policeman must ultimately decide whether the defendant was present at the place for an unlawful purpose. The court then went on to say that this construction requiring the police to offer a suspect an opportunity to explain his innocence was to continue in force only so long as it did not become a complication under the "evolving view of the self-incrimination provision of the Fifth Amendment." [4]

With the elimination of these provisions as substantive elements of the offense, the court concluded that the statute now "requires presence at a place for an unlawful purpose. * * * The Legislature denounced (1) the act of going to a place and remaining there, (2) with intent to commit an unlawful act." The court defined "unlawful purpose" as the intent to commit a "crime or petty offense."[5] The court acknowledged that it was performing what it called "judicial surgery" in order to render the statute constitutional: "[T]he statute is an important instrument for protection of the individual, and since the Legislature would likely want the statute to remain to the extent that it may, we see no impediment to such judicial surgery as will bring the statute within the Constitution."[6]

Strictly speaking, the "judicial surgery" performed in Zito is dictum. For the court found that the search which was incident to the defendant's arrest under the Disorderly Persons law was legally justified on a number of grounds and that it would be valid even if the statute were unconstitutional.[7] Nevertheless, the opinion of Chief Justice Weintraub clearly is a studied declaration of the construction which is to be given to the statute and was laid down for the guidance of the courts of New Jersey. We therefore accept it as authoritative.

The purpose of the statute as described in Zito [8] is to "nip crime in the

3. 54 N.J. at 215, 254 A.2d at 774.

4. 54 N.J. at 218, 254 A.2d at 775.
   In United States v. Margeson, 259 F. Supp. 256 (E.D.Pa.1966), a district court deemed the "good account" provision unconstitutional. See the discussion of this case in Zito, 54 N.J. at 214–215, 254 A.2d at 773.

5. 54 N.J. at 215, 254 A.2d at 773.

6. 54 N.J. at 218, 254 A.2d at 775.

7. In the first place, the court held that the product of a search should not be suppressed if the search was made in good faith upon the strength of a statute later declared unconstitutional, for such a search would not be unreasonable. Sec-

ondly, the court held that the police had reasonable grounds to arrest for other offenses which could support the search and "it would be a windfall to the criminal, and serve no laudable end" to suppress the evidence of guilt on the fortuitous ground that the arresting office had selected one of the bases which was later found inadequate. The search, therefore, could not be held unreasonable under the Fourth Amendment since there was ample cause for the arrest known to the arresting officer.

8. Reaffirming what had earlier been said in State v. Salerno, 27 N.J. 289, 294–295, 142 A.2d 636, 638 (1958).

beginning" by reaching back before the attempt stage and thereby head off the commission of an intended offense.[9]

The Supreme Court of New Jersey had earlier held that there must be allegation and proof of the specific substantive offense intended, and therefore general charges of having an unlawful purpose are insufficient under the statute. State v. Salerno, 27 N.J. 289, 142 A.2d 636 (1958).[10] Even as so defined the element of "unlawful purpose", viewed alone, would proscribe mere thought. *Zito* expressly disavows such a construction of the statute, however, and requires the additional element of presence at or going to a place for such purpose.[11] But if the statute is construed to denounce "presence at a place" for an unlawful purpose, difficult problems of constitutionality immediately arise. For what does "presence at a place" add to mere thought or criminal intent? Suppose one has innocently arrived at a place and forms there the intent to commit a crime or petty offense. If this violates the statute, then criminality will be declared and punishment inflicted for the existence of thought alone, since presence somewhere is a universal fact. A person who enters a jewelry store to shop would violate the statute if, struck by the beauty of a sparkling gem, he formed the intent to steal it, even though he stifled the criminal idea before it found expression in any conduct or overt act. Everyone would become a criminal, for all of us are subject to such wayward thoughts which find their way into the mind while the body inevitably occupies some earthly place. This construction would make the statute flagrantly violative of the First and Fourteenth Amendments.[12] Since the Supreme Court of New Jersey has been careful to narrow the contours of the statute in an effort to keep it within the bounds of constitutionality, we will assume that it would not give it such a construction.

Accordingly, we read the second element as requiring, not that one merely be present at some place when the criminal intent arises, but rather that he go there for the purpose of executing a criminal intent already formed. Thus, in the illustration we have given, if one should go to a jewelry store not to shop but to steal a gem he had already seen, he would be guilty of a violation of the statute on arriving at the store.

Is the statute constitutional under this narrowed interpretation? In considering this question we have looked to the statute's history as well as its words. The roots of the statute are in the old vagrancy laws[13] which deal in general

9. 54 N.J. at 215, 254 A.2d at 773.

10. Since we consider here only the constitutionality of the statute on its face, we are not concerned with the adequacy of the criminal complaints against any of the plaintiffs.

11. "[The statute] of course does not penalize mere thought. Indeed it does not penalize acts of preparation as such, for it requires presence at a place for an unlawful purpose." 54 N.J. at 215, 254 A. 2d at 773.

12. See Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Powell v. Texas, 392 U.S. 514, 543–544, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (Black, J., concurring); American Communications Assn. v. Douds, 339 U.S. 382, 435–444, 70 S.Ct. 674, 94 L.Ed. 925 (1950) (opinion of Jackson, J.). See also

the well-known discussions of freedom of thought and opinion by Cardozo, J., in Palko v. Connecticut, 302 U.S. 319, 326–327, 58 S.Ct. 149, 82 L.Ed. 288 (1937), overruled on other grounds in Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); and by Holmes, J., dissenting in United States v. Schwimmer, 279 U.S. 644, 654–655, 49 S.Ct. 448, 73 L.Ed. 889 (1929), overruled in Girouard v. United States, 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946), and in Abrams v. United States, 250 U.S. 616, 626–631, 40 S.Ct. 17, 63 L.Ed. 1173 (1919).

13. See 2 Radzinowicz, A History of English Criminal Law 18 et seq. (1957); 3 Stephens, A History of the Criminal Law of England 266–75 (1883). See generally Nichols, A History of the English Poor Law, vols. 1 and 2 (1898 ed.); Mackey,

with those whose condition of vagrancy excites the suspicion that they may have in mind some unlawful purpose. These laws were an expression of the antagonism felt by the respectable members of the community toward the poor and the unsettled. The common law, unrestrained by constitutional guarantees such as those we enjoy in the Bill of Rights, had no inhibition against condemning those who were without a known occupation or a fixed place of abode and were therefore believed habitually inclined to the commission of crime.[14] But we have progressed beyond the social stratification in which it was so congenial to condemn crimes of status that a Dogberry's smattering of knowledge would make all "vagrom men" fit game for the watch.[15] Today we closely

scrutinize such laws because of their usual vagueness and susceptibility to abuse.[16]

■ In this light, we find that even under the most limited construction, the statute is invalid because of the vagueness of the "place" to which a defendant must go with an unlawful purpose. Since "place" may not be wherever a thought occurs to commit an unlawful act, it must at least be a place to which one has gone for that purpose. This, however, could be as broad as the boundaries of the State of New Jersey or of any city or other political subdivision in the state to which a person may go. However numerous the illustrations of a crime or petty offense which one may intend to commit, these are at least bounded by the Criminal Code of New

A History of the English Poor Law vol. 3 (1900) ; 4 Blackstone, Commentaries *169–70.

14. Blackstone describes the punishment of wandering soldiery and gypsies:

"A third species of felony against the good order and economy of the kingdom is by idle *soldiers* and *mariners wandering* about the realm, or persons pretending so to be, and abusing the name of that honorable profession. * * *

"Outlandish persons calling themselves *Egyptians* or *gypsies* are another object of the severity of some of our unrepealed statutes. These are a strange kind of commonwealth among themselves of wandering impostors and jugglers, who were first taken notice of in Germany about the beginning of the fifteenth century, and have since spread themselves all over Europe. * * * [I]n 1530 they are described, by statute 22 Hen. VIII. c. 10, as 'outlandish people, calling themselves Egyptians, using no craft nor feat of merchandise, who have come into this realm, and gone from shire to shire and place to place in great company, and used great, subtil, and crafty means to deceive the people, bearing them in hand that they by palmestry could tell men's and women's fortunes, and so many times, by craft and subtility, have deceived the people of their money, and also have committed many heinous felonies and robberies.' * * *" 4 Blackstone, Commentaries *164–166.

15. Shakespeare's "Much Ado About Nothing," Act III, scene iii, at line 26.

16. The words of Frankfurter, J., dissenting in Winters v. New York, 333 U.S. 507, 540, 68 S.Ct. 665, 682, 92 L.Ed. 840 (1948) are frequently quoted:

"These [vagrancy] statutes are in a class by themselves, in view of the familiar abuses to which they are put. [Citation]. Definiteness is designedly avoided so as to allow the net to be cast at large, to enable men to be caught who are vaguely undesirable in the eyes of the police and prosecution, although not chargeable with any particular offense. In short, these 'vagrancy statutes' and laws against 'gangs' are not fenced in by the text of the statute or by the subject matter so as to give notice of the conduct to be avoided."

See Ricks v. District of Columbia, 134 U.S.App.D.C. 201, 414 F.2d 1097 (1968) ; Hawaii v. Anduha, 48 F.2d 171 (9 Cir. 1931) ; Lazarus v. Faircloth, 301 F.Supp. 266 (S.D.Fla.1969) (three-judge court) ; Baker v. Bindner, 274 F.Supp. 658 (W.D.Ky.1967) (three-judge court). See generally, Annotation, 25 A.L.R.3d 792 (1969) ; Amsterdam, Federal Constitutional Restrictions on The Punishment of Crimes of Status, Crimes of General Obnoxiousness, Crimes of Displeasing Police Officers, and the Like, 3 Crim.L.Bull. 205 (1967) ; Douglas, Vagrancy and Arrest on Suspicion, 70 Yale L.J. 1 (1960) ; Foote, Vagrancy-Type Law and its Administration, 104 U.Pa.L.Rev. 630 (1956).

Jersey. But going to a place with the intent to commit a crime or petty offense amounts to no more than presence at the place where a criminal purpose is entertained with the added element only that the purpose has been formed elsewhere. It is not clear at what point in time or place the criminal offense comes into existence. Does the violation of the law arise upon entry into the state for an unlawful purpose which is to be consummated some days or weeks later? Is the spatial range restricted to the actual spot—in a building or on the grounds—where one intends to commit the crime?[17] And how is the spatial element determined for crimes and petty offenses dealing with condition or status, such as loitering and disorderly conduct?

The statute is not, for example, like New Jersey's burglary law [18] which proscribes entrance into one of certain specific structures with the intent to commit one of certain enumerated felonies therein, thus identifying precisely the situs of the crime. While applying to the universe of crimes and petty offenses, the statute makes no attempt to limit "place" to a specific or identifiable location or an area which could be deemed its curtilage, nor does it establish some modern and perhaps even broader equivalent of it.[19]

There may well be an area of preparation preceding attempt in which the state may act,[20] but since it lies on the borderland of protected freedom of thought the constitutional boundary line must be clearly drawn.[21] Here the effort

17. In *Vito*, the defendant was arrested in an automobile parked across the street from the tavern which he intended to rob. 54 N.J. at 211, 254 A.2d at 771.

18. N.J.S. 2A:94-1, N.J.S.A.
"Any person who willfully or maliciously breaks and enters, or enters without breaking, any building, structure, room, ship, vessel, car, vehicle or airplane, with intent to kill, kidnap, rob, steal, commit rape, mayhem or battery, is guilty of a high misdemeanor."

19. For example, even the broad provision of the Model Penal Code dealing with "loitering or prowling" seeks to avoid the temporal and spatial problems of pre-attempt conduct by specifying as elements of the offense circumstances which are indicative of criminal activity.
The Proposed Official Draft (1962) provides:
"§ 250.6 Loitering or Prowling.
"A person commits a violation if he loiters or prowls in a place, at a time, or in a manner not usual for law-abiding individuals under circumstances that warrant alarm for the safety of persons or property in the vicinity. Among the circumstances which may be considered in determining whether such alarm is warranted is the fact that the actor takes flight upon appearance of a peace officer, refuses to identify himself, or manifestly endeavors to conceal himself or any object. Unless flight by the actor or other circum-

stances makes it impracticable, a peace officer shall prior to any arrest for an offense under this section afford the actor an opportunity to dispel any alarm which would otherwise be warranted, by requesting him to identify himself and explain his presence and conduct. No person shall be convicted of an offense under this Section if the peace officer did not comply with the preceding sentence, or if it appears at trial that the explanation given by the actor was true and, if believed by the peace officer at the time, would have dispelled the alarm."

20. See *United States v. Coplon*, 185 F.2d 629, 632-633 (2 Cir. 1950) (L. Hand, J.), cert. denied 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952); *Commonwealth v. Peaslee*, 177 Mass. 267, 59 N.E. 55 (1901) (Holmes, C. J.). *Commonwealth v. Kennedy*, 170 Mass. 18, 48 N.E. 770 (1897) (Holmes, J.). See generally, Wechsler, Jones, and Korn, Inchoate Crimes in the Model Penal Code, 61 Colum.L.Rev. 571, 586-612 (1961); Hall, Criminal Attempt—A Study of Foundations of Criminal Liability, 49 Yale J.L. 789, 817-28 (1940); Sayre, Criminal Attempts, 41 Harv.L.Rev. 821, 843-58 (1928).

21. N.A.A.C.P. v. Button, 371 U.S. 415, 432-433 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Smith v. California, 361 U.S. 147, 150-151, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959).

prophylactically to stamp as criminal what has not yet erupted into a crime or criminal attempt affects not merely freedom of thought but also freedom of movement into the state and of travel within the state.[22]

The attempt in *Zito* to justify the constitutionality of the statute by analogy to the crime of conspiracy [23] is unpersuasive. The law of conspiracy does indeed condemn conduct which can be classified as pre-attempt and the contours of the offense are concededly broad and ill-defined.[24] But in conspiracy the agreement which is an essential element of the crime is itself an unambiguous act which goes beyond mere intention.[25] Moreover, the law of conspiracy is framed against special dangers and provides safeguards against conviction of the innocent. Its theory is that concerted action threatens greater danger to society and contains the risk of continuation of criminal conduct.[26] There is also a greater probability in conspiracy that criminal action will ensue, since it is more difficult for one to turn away from a group he has joined than it is to change his own intention.[27] Furthermore, the otherwise elusive criminal intent is given expression when one shares his plans with others and enters into an agreement with them to commit a crime.[28]

We need not decide to what extent the state may constitutionally make a crime of conduct preceding an attempt. But if it seeks to do so it must be with clarity and precision sufficient to neutralize the vagueness which surrounds the pre-attempt area so that the determination when one has become guilty of a crime is not left in uncertainty. The present statute, despite the limited operation to which the Supreme Court of New Jersey has restricted it, remains too vague and fails to define with constitutional definiteness when one crosses the boundary between thought and criminal conduct.[29] It fails to provide adequate standards to insure a fair administration of the law.[30]

22. See Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) and cases cited therein.

23. "Where several agree to commit a crime, as appears to be the case before us, the conspiracy statute may be invoked even though a substantive offense is not yet attempted, but when only one individual is involved, there must be another way to deal with the same threat. This is the aim of the statute, and it applies whether there are one or more." 54 N.J. at 215, 254 A.2d at 773.

24. See Mr. Justice Jackson's well-known observations in Krulewitch v. United States, 336 U.S. 440, 455–448, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (concurring opinion).

25. Harno, Intent in Criminal Conspiracy, 89 U.Pa.L.Rev. 624, 629, 635 (1941); Sayre, Criminal Conspiracy, 35 Harv. L.Rev. 393, 399 (1922).

26. Callanan v. United States, 364 U.S. 587, 593–594, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961); Krulewitch v. United States, 336 U.S. 440, 448–449, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concur-

ring); Pinkerton v. United States, 328 U.S. 640, 644, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); United States v. Rabinowich, 238 U.S. 78, 88, 35 S.Ct. 682, 59 L.Ed. 1211 (1915); United States v. Lancaster, 44 F. 896, 899 (W.D.Ga. 1891); 2 Bishop, New Criminal Law § 173 (8 ed. 1892).

27. Callanan v. United States, 364 U.S. 587, 593–594, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961); Note, 62 Harv.L.Rev. 276, 283 (1948).

28. Note, Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920, 923–24 (1959); Harno, Intent in Criminal Conspiracy, 89 U.Pa.L.Rev. 624, 629, 635 (1941); Note, 62 Harv.L.Rev. 276, 283 (1948).

29. See Ashton v. Kentucky, 384 U.S. 195, 200–201, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966); Baggett v. Bullitt, 377 U.S. 360, 366–374, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939).

30. See Interstate Circuit, Inc. v. Dallas, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d

It strikes against freedom of thought, freedom of expression and freedom of movement, and permits the state to impose its restraining hand upon innocent persons in order to make certain that no criminal act lies at the ultimate terminus of thought. This the state may not do.

## II.

N.J.S. 2A:170–29(1), N.J.S.A. provides:

> "Any person who utters loud and offensive or profane or indecent language in any public street or other public place, public conveyance, or place to which the public is invited
> * * *

> "Is a disorderly person."

Plaintiffs attack this provision on the ground that a state's regulation of speech which is not limited to the prevention of a breach of the peace or a public nuisance violates the First and Fourteenth Amendments. They rely heavily on Williams v. District of Columbia, 136 U.S.App.D.C. 56, 419 F.2d 638 (1969), dealing with a provision of the District of Columbia Code making it illegal for any person "to curse, swear, or make use of any profane language or indecent or obscene words * * * in any street * * * or in any other public place. * * *" D.C.Code 1967, § 22–1107. *Williams* did not decide the constitutionality of the provision, but set aside a conviction on a complaint which failed to charge that the language was spoken in circumstances which threatened a breach of the peace, defined by the court as language tending

to provoke violence or so offensive to those hearing it as to amount to a public nuisance.

The statute before us, like that of the District of Columbia, does not specifically require that the words spoken must threaten a breach of the peace, either by provoking violence or by being so offensive to the hearers as to constitute a public nuisance.

In this era which has seen the advocacy of ideologies so passionate that they have exploded into world war, and internal differences so acute that they have erupted into domestic violence, the federal courts have stood firm in the enforcement of the First Amendment freedoms of speech and expression. These freedoms have even been invigorated by the sharpened judicial measurement of their depth and strength in concrete encounters with unpopular and even sinister beliefs. So it is that in a time of unparalleled pressure and novelty in the assaults on tradition and authority, the First Amendment remains a powerful shield in the armament of the faith to which the authors of the Constitution subscribed. These experiences have led to the suggestion of a doctrine of absolute freedom of speech. This would end the fear that the acknowledgement that speech may be condemned under certain circumstances risks an erosion or loss of the freedom itself because it requires that human institutions be entrusted with the power to decide where the line may be drawn. This view, however, has not prevailed in the Supreme Court, and the rule remains that freedom of speech is not absolute, whatever may be the variations in describing its boundaries.[31]

---

225 (1968); Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966); N.A.A.C.P. v. Button, 371 U.S. 415, 432–433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Amsterdam, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67 (1960).

31. Konigsberg v. State Bar of California, 366 U.S. 36, 49–51, 81 S.Ct. 997, 6 L.Ed. 2d 105 (majority opinion), 56 et seq. (Black, J., dissenting) (1961). See Douglas, J. concurring in Brandenberg v. Ohio, 395 U.S. 444, 450, 89 S.Ct. 1827, 23 L.Ed.2d 430 et seq. (1969); dissenting in Ginsberg v. New York, 390 U.S. 629, 650, 88 S.Ct. 1274, 20 L.Ed.2d 195 et

The First Amendment, made applicable to the states by the Fourteenth Amendment, therefore has not stripped from the states all power to condemn speech, whatever its character or the circumstances surrounding its utterance.

In the domain of restriction of speech involved in the present type of statute, at least two legitimate state interests may be recognized. Their aim is to protect the hearer's sensibilities to personal abuse and they therefore deal with the effect of the words spoken on the hearer and do not express any purpose of the state to control the moral standards of the speaker.

■■■ There is in the first place a practical purpose served by this protection of the sensibilities of the hearer. Condemned is the use of epithets or personal abuse in a public place which are of such a nature that they will provoke physical retaliation against the speaker and thereby create an immediate breach of the peace,—described as "fighting words" in Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Of course, the imminence of physical retaliation where the provocation does not exist or is inadequate is a result without adequate cause to justify a restriction of freedom of speech. So it was pointed out in Cantwell v. Connecticut, 310 U.S. 296, 309, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940), that the decisions upholding punishment of utterances likely to provoke violence are found on examination to have dealt with language which contained "profane, indecent, or obscene remarks directed to the person of the hearer." Nor can speech be forbidden merely on the ground that it causes or threatens a breach of the peace, for the violent reaction of the hearer may result from his taking offense at the ideas rather than the language of the speaker.[32] The free communication of ideas cannot be regulated and if intolerance to ideas threatens a breach of the peace, it is the duty of the state to protect the speaker and not to suppress the communication of the idea which offends the hearer.

■■■ Even where there may be no tendency to provoke physical retaliation the state still has a legitimate interest in protecting the sensibilities of its citizens from the shock created by the use of offensive language. This interest is among the categories enumerated by Mr. Justice Harlan, speaking for the majority, in the very recent analysis of the subject by the Supreme Court in Street v. New York, 394 U.S. 576, 591, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969). It is based on an appraisal of the effect of the words themselves[33] and does not re-

seq. (1968); and dissenting in Ginzburg v. United States, 383 U.S. 463, 491, 86 S.Ct. 942, 16 L.Ed.2d 31 et seq. (1966). See Black, J., dissenting in Mishkin v. New York, 383 U.S. 502, 515, 86 S.Ct. 958, 16 L.Ed.2d 56 et seq. (1966); and in Ginzburg v. United States, 383 U.S. 463, 476, 86 S.Ct. 942, 16 L.Ed.2d 31 et seq. (1966).

32. Street v. New York, 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); Ashton v. Kentucky, 384 U.S. 195, 199–200, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966).

"This breach of the peace theory is peculiarly liable to abuse when applied against unpopular expressions and practices. It makes a man a criminal simply because his neighbors have no self-control and cannot refrain from violence." Chafee, Free Speech in the United States 151 (1941).

33. See Stanley v. Georgia, 394 U.S. 557, 567, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Chafee, Free Speech in the United States 149–150 (1941).

"Coarse or indecent language is penalized * * * regardless of any actual or presumed tendency to evoke disorder among the hearers, since the interest we seek to protect is freedom from present nuisance rather than freedom from anticipated violence. * * * A rule that words may be punished only if they tend to provoke violence would give immunity to disgusting public verbal behavior merely because the unwilling audience comprised only persons too timid, weak, or well-behaved to respond with disorderly violence." Model Penal Code § 250.1, Comment at 7 (Tent.Draft No. 13, 1961). Cf. Comment, 83 Harv.L.Rev. 147, 152–154 (1969).

quire that they have a tendency to provoke a breach of the peace.

■ With these guiding considerations, we turn to the words of the statute before us, mindful that if it is possible the statute must be construed to conform within the framework of constitutionality.[34]

■ So read, "loud and offensive" means that the words are not to be measured by an abstract standard but rather by their purpose and effect in the individual case. To be "loud" the words must be sufficiently audible to be heard by others and the speaker must have intentionally pitched them to this purpose. The legislature was not dealing in metaphysical problems such as whether a sound is made when a tree falls in a forest in which no human beings are present. A whisper, secretly overheard by an electronic or amplifying device would not fall within the statute.

We read "offensive" as meaning that the words are spoken with the intention to disturb the hearers[35] in the restricted manner of being "profane" or "indecent," words which are descriptive or epexegetical of "offensive." The hypothetical case put in *Williams* of the spontaneous profanity coming from the "hapless stonemason" who accidentally strikes his toe would be outside the statute, as would also be profane words spoken casually without any intent to offend others. Excluded also is speech intended to be offensive if its effect is simply the result of the idea it communicates. As with "fighting words," the consequence of offensiveness must follow from the nature of the words as "profane" or "indecent."

Thus read, the statute means that words spoken in a public place must be loud and offensive in the sense that they are heard by members of the public, as the speaker intended, and were uttered with the intention to disturb the hearers because they were profane and indecent in character.

The Supreme Court of New Jersey in *Zito* indicated its willingness to carve out subordinate provisions of a statute in order to make the remainder constitutionally viable. The reading which we give to this statute eliminates none of its provisions but defines them precisely, in a manner consistent with First Amendment requirements. As so read, the statute is not overbroad, for it does not sweep under its ban any speech which is not a legitimate subject of regulation by the state.

There remains the question whether the statute as we read it suffers from a constitutional defect of vagueness. We need consider in this regard only the words "profane" and "indecent."

"Profane" was used in early times in statutory denunciation of the crime of "profane swearing."[36] In the context of our reading of the statute which requires that the words be spoken with the intention to annoy those present in a public place rather than to convey ideas regardless of their offensiveness, we do not consider "profane" so vague as to be without constitutional content. The word was used by Mr. Justice Roberts in enumerating those epithets or words of personal abuse which provoke violence and could properly be punished under the First Amendment. *Cantwell*, 310 U.S. at p. 309, 60 S.Ct. 900. In this category he also included the other word with which

---

34. See, e. g., Lynch v. Overholser, 369 U.S. 705, 710–711, 82 S.Ct. 1063, 8 L.Ed. 2d 211 (1962).

35. It is clear that scienter is a constitutional requirement. See Ginsberg v. New York, 390 U.S. 629, 643–645, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); Mishkin v. New York, 383 U.S. 502, 511, 86 S.Ct.

958, 16 L.Ed.2d 56 (1966); Gagliardo v. United States, 366 F.2d 720, 724 (9 Cir. 1966).

36. 4 Blackstone, Commentaries *59–60; 2 Bishop, New Criminal Law § 79 (8 ed. 1892). Cf. 2 Wharton, Criminal Law and Procedure § 808 (1957).

we deal, "indecent," which is more frequently discussed in cases dealing with the printed word and the motion picture than with oral utterance. In Roth v. United States, 354 U.S. 476, 491–492, 77 S.Ct. 1304, 1312, 1 L.Ed.2d 1498 (1957), Mr. Justice Brennan, discussing the California statute punishing the keeping for sale or the advertising of material that is "obscene" or "indecent," said of the argument that the words were constitutionally vague:

"Many decisions have recognized that these terms of obscenity statutes are not precise. This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process * * * These words, applied according to the proper standard for judging obscenity * * *, give adequate warning of the conduct proscribed and mark ' * * * boundaries sufficiently distinct for judges and juries fairly to administer the law * * *. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense * * *' [citation]" [37]

■ In dealing with "profane" and "indecent," we must recognize that we are considering words whose frequent use and application have established an understanding of their meaning sufficient to justify their use in a statutory provision.[38] Words are at the best difficult to restrict within absolute boundaries, and lexicographers, even when they do not differ in their definition of words, do not build the same frames in which they are confined. The meaning of the two words considered here is not so elusive or fugitive as to justify a rule of law which would forbid their use by a legislative body in circumstances where the intent with which they are uttered and the consequence they are intended to induce are prescribed elements of the offense.[39] As the Supreme Court recognized in United States v. Petrillo, 332 U.S. 1, 7–8, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947), quoted in Roth, supra, 354 U.S. at 491, 77 S.Ct. at 1312.:

" ' * * * [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. * * * ' "

■ We conclude, therefore, that the New Jersey statute (N.J.S. 2A:170–29(1), N.J.S.A.) which prohibits the utterance of certain language in a public place is not unconstitutional on its face. As we have already indicated, the New Jersey statute (2A:170–1) which prohibits going to or being at a place in New Jersey for an unlawful purpose, is unconstitutional because it violates the Fourteenth Amendment.

The parties may submit an appropriate form of order.

---

37. See Mishkin v. New York, 383 U.S. 502, 506–507, 86 S.Ct. 958, 16 L.Ed. 2d 56 (1966).

38. See Chafee, Free Speech in the United States, 149 (1941); Annotation, 48 A.L.R. 83 (1927). The same words appear in 18 U.S.C. § 1464, which prohibits the radio broadcasting of "any obscene, indecent or profane language."

39. See Mishkin v. New York, 383 U.S. 502, 507 n. 5, 511, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966).