STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOHN YOUNG, DEFENDANT-APPELLANT.

Argued September 14, 1970—Decided December 7, 1970.

*Mr. Thomas D. Hogan* argued the cause for appellant (*Mr. Stanley L. Wang,* on the brief; *Messrs. Meyner and Wiley,* attorneys).

*Mr. Gerald A. Hughes,* Assistant Prosecutor, argued the cause for respondent (*Mr. Bruce M. Schragger,* Mercer County Prosecutor, attorney).

*Mr. Clinton E. Cronin,* Assistant Attorney General, argued the cause for respondent (*Mr. Michael L. Bitterman,* Deputy Attorney General, on the brief; *Mr. George F. Kugler, Jr.,* Attorney General of New Jersey).

The opinion of the Court was delivered by

WEINTRAUB, C. J. A jury found defendant guilty on an indictment charging that he entered Trenton High School with the intent to disrupt classes therein and otherwise to interfere with the peace and good order of that school. He was fined $500. We certified his appeal before the Appellate Division acted upon it.

The statute, *N. J. S. A.* 2A:149A–2, reads:

Any person, other than a bona fide student therein or parent or legal guardian of such student or a teacher, administrator, or other school employee while in the performance of his duties, who enters any building, structure or place used for any educational purpose with the intent of disrupting classes or of otherwise interfering with the peace and good order of the place shall be guilty of a misdemeanor.

Defendant advances several constitutional issues. In one of his points, defendant argues that his entry into the school building was "innocent." We are not sure whether the thrust is only that the State is powerless to punish an "innocent" act notwithstanding the intent or purpose with which the act is done, or whether defendant contends also that there was no evidence that he entered the school with the purpose the statute forbids. We will deem both questions to be before us and deal first with the sufficiency of the proof.

I

Defendant, a lay minister, was the director of the House of Soul, a settlement facility in the City of Trenton. Some of the students of the high school gathered regularly at the House of Soul and defendant was interested in their problems. Defendant conceded he was not within the statutory exclusions, *i. e.*, that he was not a student or a parent or legal guardian of a student or an administrator or other school employee. Defendant said he felt he was a "surrogate father," but of course he does not suggest his deep interest in the students brought him within the statutory exclusion. His interest, however, was pertinent to the factual question whether he entered the school with the hostile intent the statute condemns.

Some background facts are relevant. A student had been suspended from the school for refusing to stand during the flag salute. After consulting the American Civil Liberties Union and being advised the suspension violated the Constitution, defendant dispatched a letter dated March 5, 1969 to the acting principal, with copies to the local newspapers, demanding that the disciplinary action be removed from the school record and that a letter of apology be sent to the student and his parents. The letter closed with this:

If these demands are not met, I will take appropriate action to organize the high school students to protest the injustice of this action.

On March 11 the high school was picketed by students, and defendant admitted that he planned the picketing and was in the picket line. Late on that day, Dr. Watson, superintendent of the Trenton schools, reached defendant on the phone and told him that the flag-salute incident had been resolved. Defendant agreed but said there were still other problems, whereupon Dr. Watson invited defendant to a meeting at his office at 8:30 the next morning. Defendant accepted the invitation but he did not keep it. Instead he went to the high school and the indictment arose out of his entrance into that building.

Earlier on March 11 the students planned a sit-in within the school building itself for March 12 and indeed prepared placards at the House of Soul to that end. There was no testimony that defendant knew of those plans prior to the morning of the 12th. Defendant said he then learned from his program director "that the students had planned some type of demonstration at Trenton Central High School that morning" and:

Q. So what did you do? A. Well, at that particular time I had to make a decision on whether I felt I should be at the high school or whether I should keep my appointment with Dr. Watson. [Dr. Watson's office was not at the high school.]

Q. What was your decision? A. My decision was to go to the high school.

Defendant had his program director advise Dr. Watson that he would not keep the appointment and suggest to Dr. Watson that he meet defendant at the school.

When defendant reached the high school he asked to see Dr. Daniels, the acting principal, and was ushered to his office by a policeman. In defendant's words, "I said to him [Dr. Daniels] that there are a group of students that would like to talk to you about some of their grievances." Dr. Daniels received the students in his office, but the meeting aborted when one of the students led a march out of the office. A substantial number of students were in the corridor.

Dr. Daniels tried to have the students enter the auditorium for a grievance session but the students insisted upon the cafeteria. Dr. Daniels acceded to their choice, and a meeting was there held.

The evidence is plain that because of the "sit-in" in the corridor, the scheduled change of classes was prevented and that the existing classes had to be continued to keep the students out of the congested area; that the proceedings in the cafeteria delayed the luncheon for about an hour; that the women employed in the cafeteria were frightened by the commotion to the point where they feared to serve the food, and finally did so only upon the urging and reassurance of the school head.

Defendant's statement of his role was hard to follow. He said he went to the school because he thought he could prevent a demonstration, but the jury could find that on the contrary his purpose was to support the sit-in by his presence, his words, or both, thereby to bring about the very interruptions that occurred. When Dr. Daniels found defendant with a group of the students in the hall after they left his office, Dr. Daniels said to defendant, "You are causing me much trouble now. You are disrupting the school, you should leave," and "You are making the job very difficult for me." Defendant answered, "You didn't have to take this job." Dr. Daniels then handed defendant a copy of the law under which this conviction was had, stating that "You are disrupting this school in violation of this law," to which defendant replied, "Dr. Daniels, don't show me just one law, show me all the laws that pertain to me." Defendant himself testified essentially to the same effect.

Although defendant disavowed a leadership role when asked by Dr. Daniels to intervene to end the sit-in, yet there was testimony that defendant said in the students' presence that "the students had grievances to be heard and that he wanted to have them heard with the proper authorities" and that "generally what he was saying to the students, that they would remain until they could get a proper hearing

with the officials of the school"; that when he was asked to leave, defendant said "He was going to remain and see that the youngsters were given what he thought was a proper education."

Dr. Watson testified that when he talked with defendant on the night of March 11, defendant said he was satisfied with the disposition of the flag-saluting issue, but that defendant "was concerned with some of the other student demands"; that on March 12, following a call from Dr. Daniels, Dr. Watson talked with defendant by phone and asked him why he went to the school rather than to Dr. Watson's office, to which defendant replied, "Well, I have kids here. I am concerned with their problem. I can accomplish far more when I am here with the students than at your office." Dr. Watson testified that when he came to the high school in response to the request of Dr. Daniels, he told defendant that he would be glad to talk with the students, and asked defendant to use his influence with the students to get them into the auditorium, but defendant insisted "I'm not leading the group"; that after the crowd entered the cafeteria, he repeatedly asked defendant to cooperate to end the disorder, but defendant answered that "I am not leading these kids. They have their own concerns. I am just supporting them here. I am not leading them." Dr. Watson said, "I told him three distinct times his behavior was not acceptable and that he should leave the building. I told him I didn't think he was contributing anything to the situation. I thought he should leave the building," but defendant did not leave. Dr. Watson reminded defendant that Dr. Daniels had shown defendant a copy of the statute here involved whereupon Dr. Watson received the same response, that "Dr. Daniels should have shown me all the laws regarding me." Defendant finally left the building at the request of a State Trooper, and the testimony was that the disorder thereupon ended.

A police officer, who was a member of the Community Relations Unit of the police department and who was on

duty at the high school on March 12, testified that defendant became "very loud and boisterous" after reading the copy of the statute handed him by Dr. Daniels; that after saying that "he didn't want to hear some of the laws, he wanted to hear all of the laws," defendant "informed Dr. Daniels that they would stay in the corridors until hell freezes, if necessary"; that when the officer asked defendant to leave the cafeteria "for the good of all those concerned,"

* * * Mr. Young informed me that he was not going to leave the cafeteria, Mr. Young became very loud, very boisterous, and he again said to me he would remain there, if necessary, until hell freezes over. This is the same statement he made to Dr. Daniels upstairs. He also informed me that he was afraid of 'no damn cops'.

The witness said "there was chaos in the cafeteria"; that defendant, without any apparent invitation, "took the microphone from one of the students who was there and that's when he informed the student body that he was afraid of no damn cops"; that defendant did not try to calm the students, but rather "He infuriated the students, he himself. I don't know what happened to the man that particular day; it really shocked me."

There was further testimony that when defendant finally told the students over the loud speaker system that he was leaving, "he asked them to return with him if they desired to the House of Soul where they could continue their conversations." A defense witness said she was the one who urged the students to follow defendant when he left and that she and some other students did leave with him.

The defense testimony in the main squared with the State's proof, except for defendant's denial that he said he would remain until "hell freezes over" and that he was afraid of "no damn cops." But defendant denied he had a "leadership" role. As to the reason why he went to the school, he said "I had the strong feeling, and maybe I can't articulate the feeling, it was something, a feeling, you know,

I had to be there at the school. I had to figure out, you know, I wanted to be there." He added that "I know I had that appointment that morning with Dr. Watson and that appointment was important to me, but I guess the welfare and well-being of those students I had to figure out what was most important to me, and I felt if I were there that morning I could avoid any disruption. I mean that when I am talking disruption of anything happening, anyone being hurt or any violence erupting at that school. That's why I was there." He explained his role in the cafeteria this way:

Well, at that particular time I was down there and I guess I know sometimes how demonstrations, you know, come off, I felt at that particular time I would have liked to have set the tone for the behavior of people that were attending that meeting, I felt there was an opportunity then to do it. So I went up to the microphone and I requested that anyone that was there who did not have any legitimate grievance or that was there to create a problem that I requested that they leave, because I felt there was some students there that had some legitimate gripes and if that kind of behavior, of any kind of disruptive behavior was exhibited it would work to the detriment of the grievances of the students they had there, so if they could not help them I would prefer them to leave.

It of course is not within our province on this review to decide the factual issue of guilt. Rather the question is whether the evidence could fairly support a finding by a jury that guilt was established beyond a reasonable doubt. If the evidence is sufficient to that end, the jury's finding must be respected. We are satisfied the evidence was ample. The issue was whether defendant, when he entered the school building, did so "with the intent of disrupting classes or of otherwise interfering with the peace and good order of the place." On the basis of the circumstances antedating his entry and the facts relating to his behavior after the entry, the jury could reasonably find that defendant came to the school with the intent to support the sit-in and thereby to disrupt classes and to interfere with the peace and good order of the place.

## II

█ Defendant asserts the statute violates the equal protection clause of the Fourteenth Amendment because it excludes from its prohibition "a bona fide student therein or parent or legal guardian of such student or a teacher, administrator, or other school employee while in the performance of his duties."

### A

We see no difficulty when the statute is "measured by the traditional test for a denial of equal protection: whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid state objective." *Turner v. Fouche*, 396 *U. S.* 346, 362, 90 *S. Ct.* 532, 541, 24 *L. Ed.* 2d 567, 580 (1970).

The Legislature sought to protect the educational process from disruption of classes or other interference with the peace and good order of a school. To that end, the Legislature decided to prohibit conduct preparatory to such disruption or interference. Accordingly the statute makes it a misdemeanor to enter the school building if the entry is made with the prohibited intent.

The statute being addressed to an act of entry accompanied by the forbidden intent, the Legislature could reasonably decide to exclude from its scope those individuals whose connection with the educational process would readily account for their entry into the school building. A justification for the exception is not hard to find. Since the excepted individuals have an evident reason to enter the school building, it might be difficult to prove satisfactorily that they came there with the forbidden intent. Further, it being to the benefit of the educational process that they come to the school in pursuit of their interests, they should not be dissuaded by the fear that later events may suggest they came for some hostile end. In addition, the Legislature could find those individuals are not the probable source of the evil

with which it was concerned. For these reasons, the Legislature could rationally decide the public interest would not be served, and indeed might be disserved, if those persons were brought within the statute.

Accordingly the situation comes readily within the highly discretionary power of the Legislature to deal with an evil by a measured step against it. *David v. Vesta Co.*, 45 *N. J.* 301, 314–315 (1965); *New Jersey Restaurant Ass'n v. Holderman*, 24 *N. J.* 295, 300–302 (1957). As we said in those cases:

> Thus, it is not enough to demonstrate that the legislative objective might be more fully achieved by another, more expansive classification, for the Legislature may recognize degrees of harm and hit the evil where it is most felt. * * * The Legislature may thus limit its action upon a decision to proceed cautiously, step by step, or because of practical exigencies, including administrative convenience and expense, * * * or because of 'some substantial consideration of public policy or convenience or the service of the general welfare.' * * * Hence it may 'stop short of those cases in which the harm to the few concerned is thought less important than the harm to the public that would ensue if the rule laid down were made mathematically exact.'

Especially must this be true with respect to penal legislation. It is not unusual for a criminal measure to be a precise response to a specific situation. It may be that the same evil could be found in other settings but it would hamstring the Legislature to compel it to search everywhere before it acts.

The legislative body is better situated than a court to know whether legislation is needed, and if so, the area within which the evil should be met. It is therefore appropriate that the judiciary, which can rarely have a record adequate for a better evaluation, should defer to the legislative judgment unless the classification is plainly indefensible. We of course are not speaking of lines drawn on racial, ethnic, national or religious bases, which, being inherently suggestive of the invidious, may *per se* invalidate a classification or at least make the classification "suspect." See *Loving v. Vir-*

*ginia,* 388 *U. S.* 1, 87 *S. Ct.* 1817, 18 *L. Ed.* 2d 1010 (1967). In the case at hand, nothing of that kind determines who is within or without the class subject to punishment.

## B

Defendant says that if the classification may stand under the traditional test we have just applied, still it must fall under decisions of the United States Supreme Court which require that a "compelling state interest" be shown to sustain classifications in certain areas. This controversial concept[1] has been applied to statutes denying the right to vote, *Kramer v. Union Free School District No.* 15, 395 *U. S.* 621, 89 *S. Ct.* 1886, 23 *L. Ed.* 2d 583 (1969); *Evans v. Cornman,* 398 *U. S.* 419, 90 *S. Ct.* 1752, 26 *L. Ed.* 2d 370 (1970). The same concept was invoked with respect to a residency requirement for welfare benefits, and this upon a finding that the denial of benefits impaired the constitutionally secured right to travel. *Shapiro v. Thompson,* 394 *U. S.* 618, 89 *S. Ct.* 1322, 22 *L. Ed.* 2d 600 (1969). We note that in *Dandridge v. Williams,* 397 *U. S.* 471, 90 *S. Ct.* 1153, 25 *L. Ed.* 2d 491 (1970), where a statute relating to county welfare benefits fixed a maximum limit without regard to the number of the members of a family, but where, unlike *Shapiro,* the statute did not draw a line related to migration, *i. e.,* residency, the classification issue was resolved in conventional terms without reference to a "compelling state interest."

We cannot know how expansive the reach of the new concept will be. Suffice it to say that it has been applied to the denial of a right and indeed a right thought to involve a "fundamental interest," *i. e.,* the right to vote and the

---

[1]The concept is controversial because it raises the question whether, when the focus is upon "equal protection," the judiciary will make the kind of value judgments it long ago disavowed as to a substantive "due process" issue. *The Supreme Court, 1968 Term,* 83 *Harv. L. Rev.* 118–123 (1969-1970).

right to migrate. The statute before us does not deny to some a common right belonging to all. There is no right to enter a school building with the hostile intent the statute forbids.

### C

■ Defendant seeks to find a fatal discrimination in the context of the sundry public activities which a board of education may permit in a school building "when not in use for school purposes." *N. J. S. A.* 18A :20–34. Defendant suggests, for example, that with respect to a permitted political function in a school building, there is no reason to deal differently with those who attend, on the basis of whether they are or are not within the groups of persons excluded from the statutory penalty. We think it enough to say that the statute does not apply to such meetings. It protects the educational process and does not encompass unrelated activities permitted in a schoolhouse "when not in use for school purposes."

### D

■ We see no substance in defendant's claim that spiritually he had achieved a paternal relation with the students who came to the House of Soul and hence he is denied equal protection because he is not treated as is a parent under the statute.

### E

Finally, defendant contends, still under the equal protection heading, that the statute is overly broad. Defendant says there would be no problem if the statute were limited to "trespassers, intruders or outsiders," but since it literally could include a speaker invited to address the student body, there arises a constitutional issue of "overbreadth" because the invited speaker could be timid in his remarks for fear

that someone might later infer he entered the building for the purpose the statute forbids. Thus defendant finds an excessive inroad upon the First Amendment right of free speech.

We do not understand defendant to say that it is beyond the police power of the State to protect the educational process from the disruptions the Legislature here sought to prevent. The State of course has that power. See *Tinker v. Des Moines Independent Community School District,* 393 *U. S.* 503, 514, 89 *S. Ct.* 733, 740, 21 *L. Ed.* 2d 731, 742 (1969). Nor does defendant say the statute failed adequately to warn him with respect to the conduct for which he was convicted. The statute is adequate in its description of what is forbidden. See *State v. Smith,* 46 *N. J.* 510, 518–519 (1966), *cert.* denied, 385 *U. S.* 838, 87 *S. Ct.* 85, 17 *L. Ed.* 2d 71 (1966).

Rather defendant seeks to attack the statute, which in terms is not even addressed to the exercise of speech, upon the basis of a hypothetical situation in which someone who entered a school building for a lawful purpose and indeed in response to an official invitation might be restrained in what he says because he fears the purpose with which he entered the school could be misunderstood. In *Scales v. United States,* 367 *U. S.* 203, 229, 81 *S. Ct.* 1469, 1486, 6 *L. Ed.* 2d 782, 801 (1961), the Court responded to a like suggestion that the Smith Act "tends to inhibit the exercise of constitutionally protected rights, in that it engenders an unhealthy fear that one may find himself unwittingly embroiled in criminal liability," by saying "the answer surely is that the statute provides that a defendant must be proven to have knowledge of the proscribed advocacy before he may be convicted."

Moreover, defendant does not assert that he was intimidated with respect to his right of free speech. Rather he urges that someone else might be and asks that the statute be condemned in its entirety because of that possibility. As we have said, the statute is not addressed to the

exercise of speech. A First Amendment problem could be but incidental under the special facts of a particular case. That possibility is not the kind of threat to the First Amendment freedom which warrants departing from the usual rule that a defendant may not assail a statute, valid as to him, on the ground that it may be applied unconstitutionally to others. *United States v. Raines,* 362 *U. S.* 17, 21–22, 80 *S. Ct.* 519, 522–523, 4 *L. Ed.* 2d 524, 529–530 (1960); *State v. Moretti,* 52 *N. J.* 182, 192–193 (1968), *cert.* denied, 393 *U. S.* 952, 89 *S. Ct.* 376, 21 *L. Ed.* 2d 363 (1968).

### III

■ Defendant next contends that since he was "invited" to enter the school, his conviction for doing so violated the due process clause. He cites *Cox v. Louisiana,* 379 *U. S.* 559, 85 *S. Ct.* 476, 13 *L. Ed.* 2d 487 (1965), where demonstrators were convicted for conducting a demonstration at a place approved by the local police authorities. The Court found "sort of entrapment" on the facts before it. 379 *U. S.* at 571, 85 *S. Ct.* at 484, 13 *L. Ed.* 2d at 496.

■ There is no factual basis for the claim. Defendant was not invited to enter the school. On the contrary, he went there on his own. After he arrived, he was simply escorted to the office of the assistant principal as would be any other visitor to the school. Nor, it need hardly be said, was defendant invited into the school for the purpose of disrupting classes or to interfere with the peace and good order of the place. The offense being the entry with the forbidden purpose, the offense was complete when defendant entered the school. Thus, the later events were of no moment except insofar as they might evidence the intent with which he entered the premises. The offense, if committed, was not undone because the assistant principal did not have defendant ejected at once, or because defendant, being already there, was asked to assist in ending the disturbance.

## IV

Next, defendant contends that the act of entering a public school is in itself "blameless" and that it is beyond the power of the State to punish an innocent act merely because of a forbidden purpose. We think the police power of the State is not thus restricted.

It has long been true that guilt may turn upon the intent with which something itself innocent is possessed or done. A kitchen knife may be a weapon and a chisel a burglar tool, depending upon the intent of the holder. Almost a century ago the United States Supreme Court read a federal statute to provide that lawful goods were forfeited instantly upon their lawful movement, if they were moved with the intent to defraud the government of a tax upon them. *United States v. One Hundred Barrels of Distilled Spirits,* 14 *Wall* 44, 61, 81 *U. S.* 44, 61, 20 *L. Ed.* 815, 818 (1872).

There are a host of statutes, federal and State, which condemn acts, themselves innocent, if done with a forbidden intent. We will summarize them in approximate terms, sufficient for our immediate purpose.

The possession of certain counterfeit obligations is made criminal but only if the obligation is possessed "with intent to defraud." 18 *U. S. C. A.* § 480. There is nothing necessarily wrong in teaching or demonstrating the use, application or making of a firearm or explosive or incendiary device or a technique capable of causing injury or death, but 18 *U. S. C. A.* § 231(a)(1) makes it a crime to do so "intending that the same will be unlawfully employed for use in, or in furtherance of, a civil disorder which may in any way or degree obstruct, delay, or adversely affect commerce" or the performance of any federally protected function.

The right to travel in interstate commerce is fundamentally secured, but that movement is made criminal by a number of statutes wholly on the basis of evil intent. Thus

it is an offense to travel in interstate or foreign commerce if the intent is to avoid prosecution for a State felony or the giving of testimony in such a prosecution. 18 *U. S. C. A.* § 1073, and see also § 1074(a). There surely is nothing wrong with transporting a female in interstate or foreign commerce, but that innocuous act is illegal if done with the intent to induce, entice or compel her to engage in sexual misconduct. 18 *U. S. C. A.* § 2421. We have a State statute which in like fashion condemns the transportation of a female "through or across this State," but again only if the purpose is prostitution. *N. J. S. A.* 2A:133–12. Another statute condemns travel in interstate or foreign commerce or the use of any facility of interstate commerce if the intent is to incite a riot, and although the statute requires an overt act, the statute does not, in terms, require that the overt act be itself unlawful. 18 *U. S. C. A.* § 2101(a)(1). Similarly, the racketeering statute, 18 *U. S. C. A.* § 1952(a)(3), forbids travel in interstate or foreign commerce or the use of any of its facilities, including the mail, with the intent to promote "any unlawful activity" specified in the statute if thereafter there is performed a furthering act which act the statute does not in terms require to be itself unlawful.

There is a right to use the mails, but not if the purpose is to advance a fraudulent scheme, and the matter mailed need not in itself be calculated to carry out the scheme or be criminal or disclose the fraudulent purpose. 18 *U. S. C. A.* § 1341, note 67. And the use of a fictitious name or address is not itself prohibited but it becomes punishable if the use is to further a fraudulent scheme within the statute just cited, "or any other unlawful business." 18 *U. S. C. A.* § 1342.

The right of association is highly regarded and even a membership in an organization which advocates the overthrow of government by force or violence is not punished, but such membership may be criminal if there is knowledge of that aim and an intent to bring it about. 18

*U. S. C. A.* § 2385; see *Scales v. United States, supra,* 367 *U. S.* 203, 81 *S. Ct.* 1469, 6 *L. Ed.* 2d 782.

There is nothing inherently unlawful about entering a train, but that act is made criminal if the purpose is "to commit any crime or offense against person or property thereon." 18 *U. S. C. A.* § 1991. So, too, it is not unlawful to go upon "any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation," but it is a crime to do so "for any purpose prohibited by law or lawful regulation." 18 *U. S. C. A.* § 1382. Again, it is not a crime to enter a vessel, but it is a crime to enter "with intent to commit any felony." 18 *U. S. C. A.* § 2276.

We have already referred to *N. J. S. A.* 2A:133-12 which makes the transportation of a female a crime if the act of transportation is for the purpose of prostitution. We refer to still other statutes of our State, which, like the federal statutes just cited, turn penal liability upon an act itself innocent if done with an intent to achieve some evil end.

It is not inherently wrong to enter a "building, structure, room, ship, vessel, car, vehicle or airplane" but it is a high misdemeanor to enter "with intent to kill, kidnap, rob, steal, commit rape, mayhem or battery." *N. J. S. A.* 2A:94-1. It is a high misdemeanor to enter any building, structure, or place used for any educational purpose "with the intent of committing therein any indictable offense." *N. J. S. A.* 2A:149A-1. A gift may be a bribe, depending upon intent. *N. J. S. A.* 2A:93-7 and 10. It is a crime to burn a cross or religious symbol but only "with intent to intimidate any person or group of persons because of his or their race, color, creed or religion." *N. J. S. A.* 2A:122-12.

There are a number of statutes which make possession criminal if there is an intent to do some hostile act. See *N. J. S. A.* 2A:94-3 relating to possession of burglar tools; and see *N. J. S. A.* 2A:109-2 subds. a and b, relating to possession of counterfeits. As to weapons and explosives, see *N. J. S. A.* 2A:151-56, 59, and 60. It is a disorderly persons offense to possess certain implements if the intent

is to break and enter, or to have on one's person an offensive or dangerous weapon with intent to assault another, or to be in any place of public resort or assemblage for business, travel, worship, amusement or other lawful place, with intent to steal. *N. J. S. A.* 2A:170-3.

We refer to this array of statutes solely to evidence the widely held legislative view that such measures are within the legislative power, and to reveal the impact upon public safety and order if it should be held that government, in seeking to anticipate and prevent criminal events, may punish only if a step taken in pursuit of a criminal objective itself bespeaks criminality.

The common law concept of crime called for both an act and a wrongful intent. Intent alone would not suffice; the right, or more accurately the power, to think evil was absolute. Nor was innocuous conduct punished. But in combination, an evil purpose and an innocuous step could be explosive. And as between the two, the evil purpose is the more dangerous for it harbors the ultimate threat. For that reason, it ultimately evolved at common law that an "attempt" to commit a crime was itself punishable as a crime. The evil purpose being shown, the common law punished an act in pursuit of the purpose even though the act fell short of actual harm or injury. Nor need the act in isolation bespeak criminality. "Hence the assertion that 'an act which is in itself and on the face of it innocent, is not a criminal attempt' is untenable. It has long been held that an act might be quite innocent in itself, but found to express a criminal intention on knowledge of surrounding circumstances." Hall, "Criminal Attempt — A Study of the Foundations of Criminal Liability," 49 *Yale L. J.* 789, 825 (1940).

Generally a line is sought to be drawn between an "attempt" and mere "preparation," preparation itself not being punishable as an attempt. Nonetheless some conduct short of an attempt was punishable at common law. So a solicitation to commit a crime, though not equaling an

attempt, was dealt with as a crime. The most conspicuous proscription of the common law in anticipation of actual injury or an attempt thereat was the crime of conspiracy, for that crime required no more than an agreement for an unlawful end. The conspiracy was itself punished, realistically, not because the act of agreeing to seek an unlawful end was itself hurtful, but rather because the combination of the wills of several was "much more likely to result in evil consequences than the mere intent of only one person." 3 *Burdick, Law of Crime* (1946) § 984, p. 435. And, of course, when a conspiracy statute requires an overt act, the act need not itself be an act of criminality. *Scales v. United States, supra,* 367 *U. S.* at 225, 81 *S. Ct.* at 1484, 6 *L. Ed.* 2d at 799.

To meet the added dangers of a complex and congested society, legislatures have gone beyond the common law in punishing conduct which by common law standards might fall short of an attempt. Professor Perkins observes that "it is becoming increasingly common for legislative enactment to provide a penalty (often a severe one) for what the common law regarded as an unpunishable act of preparation." *Perkins, Criminal Law* (1957), *p.* 486. We are told that "The rule relating to acts of preparation has been abandoned in some states by statute under which any act done as a step in the commission of the intended offense is made an attempt." 1 *Wharton's Criminal Law and Procedure* (Anderson 1957), § 75, *p.* 161. We must note, however, that the statutes cited by *Wharton* seem not to be read as broadly as his text would suggest. See *Butts v. State,* 46 *Ga. App.* 174, 167 *S. E.* 209 (Ct. App. 1932) ; *Hammond v. State,* 47 *Ga. App.* 795, 171 *S. E.* 559 (Ct. App. 1933) ; *State v. Denney,* 69 *Wash.* 2d 436, 418 *P.* 2d 468 (Sup. Ct. 1966) ; *State v. Lewis,* 69 *Wash.* 2d 120, 417 *P.* 2d 618 (Sup. Ct. 1966). But the many statutes we recounted above have the common feature of punishing an act only because of the evil purpose it pursues, without regard to whether the act would constitute an attempt to commit the offense the statutes

seek to head off, and even though the act, absent such purpose, may be one protected by the Constitution.

We see no serious challenge to the power of a legislature to make it an offense to take a step, otherwise lawful, in furtherance of a hostile end. The issue was raised in *State v. Dietrich,* 117 *Kan.* 105, 230 *P.* 329 (Sup. Ct. 1924). The statute there made it a crime to enter a bank with the intent to rob. The court rejected the substantive due process attack quite summarily. We think that *Scales v. United States, supra,* 367 *U. S.* 203, 81 *S. Ct.* 1469, 6 *L. Ed.* 2d 782, supports the legislative power.[2] See also *Lupino v. United States,* 268 *F.* 2d 799, 802 (8 Cir. 1959), *cert.* denied, 361 *U. S.* 834, 80 *S. Ct.* 86, 4 *L. Ed.* 2d 75 (1959); *United States v. Lawson,* 255 *F. Supp.* 261, 266–267 (D. Minn. 1966); *Martin v. State,* 245 *Ind.* 224, 194 *N. E.* 2d 721, 726 (Sup. Ct. 1963); *Lambert v. State,* 374 *P.* 2d 783 (Okl. Ct. Cr. App. 1962); *cf. Adderley v. Florida,* 385 *U. S.* 39, 42–43, 87 *S. Ct.* 242, 244–245, 17 *L. Ed.* 2d 149, 153 (1966); but *cf. Bolin v. State,* 266 *Ala.* 256, 96 *So.* 2d 582 (Sup. Ct. 1957).

We assumed such statutes were within the police power when we decided *State v. Zito,* 54 *N. J.* 206 (1969). We

---

[2] The case involved the Smith Act, 18 *U. S. C. A.* § 2385, which denounces membership in an organization that advocates the overthrow of government by force or violence. In rejecting a substantive due process challenge to the statute, the Court said (367 *U. S.* at 225–226, 81 *S. Ct.* at 1484, 6 *L. Ed.* 2d at 799–800):

Any thought that due process puts beyond the reach of the criminal law all individual associational relationships, unless accompanied by the commission of specific acts of criminality, is dispelled by familiar concepts of the law of conspiracy and complicity. While both are commonplace in the landscape of the criminal law, they are not natural features. Rather they are particular legal concepts manifesting the more general principle that society, having the power to punish dangerous behavior, cannot be powerless against those who work to bring about that behavior. The fact that Congress has not resorted to either of these familiar concepts means only that the enquiry here must direct itself to an analysis of the relationship between the fact of membership and the underlying substantive illegal conduct, in order to determine whether that relationship is indeed too tenuous to permit its use as the basis of criminal liability. * * *

there dealt with *N. J. S. A.* 2A:170–1,[3] a petty offense statute, and endeavored to strip it of language which might render it invalid. We said, 54 *N. J.* at 215:

> A statute such as ours seeks to head off the commission of crime. It reaches a criminal plan not yet pressed to the stage of an 'attempt.' Where several agree to commit a crime, as appears to be the case before us, the conspiracy statute may be invoked even though a substantive offense is not yet attempted, but when only one individual is involved, there must be another way to deal with the same threat. This is the aim of the statute, and it applies whether there are one or more. It of course does not penalize mere thought. Indeed it does not penalize acts of preparation as such, for it requires presence at a place for an unlawful purpose. Thus the Legislature denounced (1) the act of going to a place and remaining there, (2) with intent to commit an unlawful act.
>
> We see no reason why the State may not deal penally with such an act done with that intent. *Cf. Dominquez v. City and County of Denver*, 147 *Colo.* 233, 363 *P. 2d* 661 (*Sup. Ct.* 1961); *City of Portland v. Goodwin*, 187 *Or.* 409, 210 *P. 2d* 577 (*Sup. Ct.* 1949); *City of Seattle v. Drew*, 70 *Wash.* 2d 405, 423 *P. 2d* 522 (*Sup. Ct.* 1967). Nor do we find obscurity in the words 'unlawful purpose.' An 'unlawful purpose,' as the sense of the situation suggests, is a purpose to do an act which the Legislature has forbidden upon pain of conviction for crime or petty offense. \* \* \*

Shortly after *Zito,* a three-man court held unconstitutional the same statute we there sustained. *Karp v. Collins,* 310 *F. Supp.* 627 (D. N. J. 1970). Accepting our construction of the statute, *Winters v. New York,* 333 *U. S.* 507, 514–515, 68 *S. Ct.* 665, 669–670, 92 *L. Ed.* 840, 849 (1948), the Court in *Karp* held the statute to be void for "vagueness" (310 *F. Supp.* pp. 632–635). We see nothing vague about the statute as we interpreted it. There is nothing vague about the description of the evil purpose, for the reference is to

---

[3] *N. J. S. A.* 2A:170–1 provided:

Any person who is apprehended and cannot give a good account of himself, or who is engaged in an illegal occupation and who is in this state for an unlawful purpose, is a disorderly person. In any prosecution under this section the fact that the person apprehended cannot give a good account of himself or is engaged in an illegal occupation is prima facie evidence that he is present in this state for an unlawful purpose.

existing penal statutes which must themselves pass muster on that score. Were it otherwise, the many statutes which refer to or incorporate the general body of criminal statutes would fall. We mention, for example, our statutes dealing with attempts, *N. J. S. A.* 2A:85–5, aiding and abetting, *N. J. S. A.* 2A:85–14, compounding, *N. J. S. A.* 2A:97–1, concealment of crimes, *N. J. S. A.* 2A:97–2, and conspiracy, *N. J. S. A.* 2A:98–1. See also the many federal and State statutes we recounted above, and to them may be added 18 *U. S. C. A.* § 13, which makes applicable to a federal enclave all of the penal laws of the State, territory, or district within which the enclave is situated. See *United States v. Sharpnack,* 355 *U. S.* 286, 78 *S. Ct.* 291, 2 *L. Ed.* 2d 282 (1958).

Far more troublesome in this regard is the civil rights statute, 18 *U. S. C. A.* § 242, which punishes a person who under color of law deprives an inhabitant of any right, privilege or immunity secured by the Constitution or the laws of the United States. In the attack upon that statute for vagueness, it was stressed that there was no ready source to which one might go for a specification of those guaranteed rights, but the Court upheld the statute, the plurality opinion stressing that "a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid." *Screws v. United States,* 325 *U. S.* 91, 101, 65 *S. Ct.* 1031, 1035, 89 *L. Ed.* 1495, 1502–1503 (1945). See also, *United States v. National Dairy Products Corp.,* 372 *U. S.* 29, 35, 83 *S. Ct.* 594, 599, 9 *L. Ed.* 2d 561, 567 (1963).

Nor does the statute involved in *Zito* become "vague" because, as *Karp* suggests, conceptually it may be impossible to go to a place to commit some violations of our penal laws. A statute prohibiting attempts does not fall for vagueness because one may have difficulty conceiving of an attempt to commit involuntary manslaughter, or nonfeasance in office, or nonsupport of one's wife or child, or perjury by a witness, or an official crime by one who does not hold office, or where it is "impossible" to complete the intended crime, see *State*

*v. Moretti, supra,* 52 *N. J.* at 188–189. Such uncertainties do not render a statute void for vagueness at the suit of one whose conduct is clearly covered. The situation falls within the traditional rule that a statute will not be stricken on the basis of hypothetical or uncertain applications of it, *United States v. Raines, supra,* 362 *U. S.* at 21–22, 80 *S. Ct.* at 522–523, 4 *L. Ed.* 2d at 529–530, rather than within the exceptional proposition that a statute may be enjoined in its entirety where freedom of the speech or press is the actual subject of the statute and the exercise of that freedom is manifestly hindered by the very vagueness of the prohibiting act. *Dombrowski v. Pfister,* 380 *U. S.* 479, 85 *S. Ct.* 1116, 14 *L. Ed.* 2d 22 (1965) ; *Cameron v. Johnson,* 390 *U. S.* 611, 88 *S. Ct.* 1335, 20 *L. Ed.* 2d 182 (1968).

Nor is the description of the forbidden act in *Zito* at all vague. It is most precise. It consists of going to a place and remaining there in pursuit of the evil objective. It is far more precise than the description of acts required for an attempt, which, as every treatment of the subject notes, is heavily laden with ambiguities involving proximity and the like. Vagueness is not demonstrated by saying, as *Karp* did, that "But going to a place with the intent to commit a crime or petty offense amounts to no more than presence at the place wherein a criminal purpose is entertained with the added element only that the purpose has been formed elsewhere." 310 *F. Supp.* at 633. The same comment could be equally made with respect to the statutes we have already cited involving travel in interstate commerce with the intent to do a forbidden act which the statute does not specify as to time or place. See, for example, 18 *U. S. C. A.* § 2421 (the white slave statute) and 18 *U. S. C. A.* § 2101(a)(1) (travel in interstate commerce with the intent to incite a riot), and 18 *U. S. C. A.* § 1952(a)(3) (racketeering statute). The same comment could of course be made with respect to statutes involving an entry, otherwise lawful, into an area or place with intent to commit an offense therein, of which 18 *U. S. C. A.* § 1382, which deals with

going upon a military reservation "for any purpose prohibited by law or lawful regulation," is particularly notable because of the vastness of the place, the range of the offenses, and the absence of any stipulation as to proximity in time or place.

*Karp* speaks only of vagueness. It does not say the statute sustained in *Zito* is beyond the police power of the State, *i. e.,* that travel to a place in furtherance of a forbidden purpose is too remote a threat to support the exercise of that power. And, on the subject of due process, we add that the statute, as construed in *Zito,* does not relieve the State of the burden of proving the evil purpose by permitting the innocent act to be proof of that purpose. We were careful in *Zito* to stress the State's burden to prove each constituent element of the offense, and expressly held that a failure or refusal of the accused to give a good account of his presence could not be deemed to show the evil intent. 54 *N. J.* at 214, 215–220.

In any event, the statute now before us could not be called "vague" even under the conception of vagueness embraced by *Karp*. And with respect to the reach of the police power, we do not doubt the power of the Legislature to deal with the stated threat to the educational process by punishing the act of entry if done with the hostile purpose the statute denounces. Whether the evil warrants criminal proscription and whether the statutory thesis is appropriate to that end are questions committed primarily to legislative judgment. We surely cannot claim to be better informed upon either facet and hence cannot say the legislative judgment is arbitrary.

We appreciate, of course, that all of the statutes we have cited which condemn an act, otherwise innocent, because of a forbidden intent, could be misued. But courts exist to see that they are not, and the Constitution must be read with the confidence that the judicial process will be equal to its fact-finding responsibility.

## V

The final point made is that under the charge and supplemental charge to the jury, a verdict of guilty could have been returned on a finding that the prohibited intent arose after defendant's entry into the building. No such objection was made at the trial. We think the instructions, considered as a whole as they must be, clearly told the jury it must find that defendant entered the building with the forbidden intent.

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.